**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| TITAN GROUP PARTNERS CO., LLC, and NETWORK 1 FINANCIAL SECURITIES, INC., *Plaintiffs*,<br><br>v.<br><br>TITAN ENVIRONMENTAL SOLUTIONS, INC., FRANK E. CELLI, GLENN MILLER, JEFFREY RIZZO, MICHAEL JANSEN, DOMINIC CAMPO, CARRIE GUNNELLO, CELLI SPV and DIRECT WASTE SERVICES, LLC,<br><br>*Defendants.* | Civil Action No.:<br>Hon.<br>ECF Case<br><br>**COMPLAINT**<br><br>TRIAL BY JURY DEMANDED |

Plaintiffs Titan Group Partners Co., LLC ("TGP") and Network 1 Financial Securities, Inc. ("Network 1") (collectively, "Plaintiffs"), by and through their attorneys, The Roth Law Firm PLLC, as and for their Verified Complaint against Titan Environmental Solutions, Inc. ("Titan Environmental" or "the Company"), Frank E. Celli ("Celli"), Glenn Miller ("Miller"), Jeffrey Rizzo ("Rizzo"), Michael Jansen ("Jansen"), Dominic Campo ("Campo"), Carrie Gunnello ("Gunnello"), Celli SPV and Direct Waste Services, LLC ("Direct Waste") (collectively "Defendants"), hereby alleges the following upon information and belief.

## NATURE OF THE ACTION

1. Plaintiffs, who stand in the shoes of the investors of Titan Environmental. bring this action against Defendants to recover damages arising from a brazen and multi-faceted fraudulent scheme designed to induce Plaintiffs and Network 1's investors to invest millions of dollars in Titan Environmental, a Delaware corporation, and then to steal and convert the investment proceeds for the personal enrichment of the individual Defendants and their co-conspirators.

2. This action arises from: (a) the fraudulent inducement of TGP to invest $2,500,000 in Titan Environmental' s 12% original issue discount ("OID") convertible promissory notes and purchase warrants (the "Fraudulent Note Offering") through a coordinated campaign of material misrepresentations and omissions orchestrated by Defendant Celli and his co-conspirators; (b) the subsequent theft, conversion, and misappropriation of TGP's $2,500,000 investment by Defendants; (c) the unlawful stripping and transfer of substantially all of the Company's assets to an entity formed and controlled by Celli and his co-conspirators; and (d) the fraudulent inducement of Network 1's customers to invest in Titan's Series B Convertible Preferred Stock private placement (the "Series B Offering") through material misrepresentations and omissions – including the willful concealment of the involvement of convicted felon Charles B. Rizzo as a paid consultant, the false inflation of the Company's revenue and financial projections, and active denials of known material facts, all in violation of the federal securities laws, the Racketeer Influenced and Corrupt Organizations Act ("RICO"), and New York common law.

3. Defendants' scheme was sophisticated, deliberate, and ongoing. It involved, inter alia: (i) false representations concerning the Company's business prospects, financial condition, revenues, and EBITDA; (ii) false representations concerning the Company's acquisitions and financing; (iii) false representations concerning the Company's pending uplisting from the OTC market to the NYSE/American exchange; (iv) false representations concerning firm commitment underwriting agreements with Alexander Capital, L.P. (""Alexander") and Oak Ridge Financial ("Oak Ridge"); (v) the willful and repeated concealment of the involvement of Charles B. Rizzo – a convicted felon sentenced to sixty-six months in federal prison for bribery and theft – as a paid consultant and related party of

the Company; (vi) active affirmative denials of Charles B. Rizzo's involvement when directly questioned by Network 1 representatives; (vii) the theft and misappropriation of TGP's $2,500,000 investment proceeds; (viii) the illegal asset stripping and transfer of Company assets to Celli's co-conspirators; and (ix) the deliberate cessation of required SEC reporting to conceal the foregoing wrongdoing.

4. As a direct and proximate result of Defendants' unlawful conduct, TGP has suffered a complete loss of its $2,500,000 investment, and Network 1's customers have suffered the complete or substantial loss of their investments in the Series B Offering, aggregating approximately $4,272,600. Plaintiffs bring this action to recover those losses, together with interest, punitive damages, and attorneys' fees.

## JURISDICTION AND VENUE

5. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction), 18 U.S.C. § 1964(c) (RICO) and Section 27 of the Securities Exchange Act of 1934, 15 U.S.C. § 78aa, which provides that the United States district courts shall have exclusive jurisdiction of violations of the Exchange Act and rules and regulations thereunder, and of all suits in equity and actions at law brought to enforce any liability or duty created by the Exchange Act or the rules and regulations thereunder.

6. This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367, as those claims are so related to the federal claims that they form part of the same case or controversy.

7. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act, 15 U.S.C. § 78aa. A substantial part of the events and omissions giving rise to the claims occurred in this District, including the making of material

misrepresentations to Plaintiffs, the structuring and consummation of the securities transactions at issue, and the conversion and misappropriation of Plaintiffs' investment proceeds. Titan maintained a principal office address in this District, and multiple Defendants transacted business and committed the acts complained of herein in this District.

8. In connection with the conduct described in this Complaint, Defendants, directly or indirectly, made use of the means or instrumentalities of interstate commerce, the United States mails, and the facilities of national securities exchanges.

## THE PARTIES

### Plaintiffs

9. Plaintiff TGP is a limited liability company. TGP invested $2,500,000 in Titan's Fraudulent Note Offering and suffered a complete loss of that investment as a direct result of Defendants' unlawful conduct alleged herein.

10. Plaintiff Network 1 is a registered broker-dealer that is a member of FINRA and SIPC. Network 1 obtained an assignment of the rights from the investors in Titan Environmental to pursue this action on their behalf. Network 1's principal office is located at The Galleria, 2 Bridge Avenue, Suite 300, Red Bank, New Jersey 07701. Network 1 brings this action on behalf of itself and its customers who invested in Titan's Series B Convertible Preferred Stock offering. Network 1 served as a co-placement agent for the Series B Offering and its customers collectively invested approximately $4,272,600 in the Series B Offering.

### Defendants

11. Defendant Titan Environmental is a Delaware corporation with its principal place of businesss in Bloomfield Hills, Michigan. At all times relevant hereto, Titan

Environmental was a publicly traded OTC company and a reporting company under the Securities Exchange Act of 1934. Titan Environmental purported to be in the waste management and environmental services business and was headquartered in New York.

12. Defendant Celli is an individual who resides in Rumson, New Jersey and who, at all times relevant hereto, served as a director of Titan Environmental and, at various times, as an officer and control person of the Company. Celli was the primary architect and orchestrator of the fraudulent schemes alleged herein. Commencing in or about October 2024, with the knowledge and approval of each of the other individual Defendants, Celli acted as the undisclosed Chief Executive Officer and Chairman of the Company. Celli also represented to TGP that he would become the Chief Executive Officer and Chairman of the Company upon the closing of the Fraudulent Note Offering. On October 5, 2025, Celli resigned from the Titan Environmental Board of Directors. Upon information and belief, Celli is a co-founder, member, manager, and/or control person of the Celli Co-Conspirator LLC.

13. Defendant Miller is an individual who resides in Islamorda, Florida and who, at all times relevant hereto, served as Chief Executive Officer and a director of Titan Environmental. Pursuant to a Form 8–K filed on May 24, 2023, Miller was named CEO of Titan Environmental. Miller participated in investor presentations, approved and made false and misleading statements to Plaintiffs and investors, and affirmatively denied the involvement of Charles B. Rizzo in Titan Environmental's business when directly questioned by Network 1 representatives. Miller owed fiduciary duties to Titan Environmental's investors and breached those duties.

14. Defendant Rizzo is an individual who resides in Bloomfield Hills, Michigan nd who, at all times relevant hereto, served as the Chief Operating Officer, Chief Financial

Officer, and a director of Titan Environmental. Jeff Rizzo joined Titan Environmental' s management team in connection with its merger with his company, Titan Trucking Co., in or about May 2023, and he served as Titan Environmental's COO beginning on or about May 19, 2023. Jeff Rizzo is the brother of Charles B. Rizzo, a convicted felon whose involvement with Titan Environmental was deliberately concealed from investors. Jeff Rizzo actively participated in marketing presentations to Network 1 customers without disclosing his brother's involvement in Titan Environmental's business.

15. Defendant Jansen is an individual who resides in Pleasant Ridge, Michigan and who served as Chief Financial Officer and/or an officer of Titan Environmental at times relevant hereto. On or about July 16, 2024, Jansen, as Titan Environmental's CFO, provided Network 1 representatives with a copy of Titan Environmental's cap table. Jansen participated in the fraud alleged herein by providing false and misleading financial information to investors and their representatives.

16. Defendant Campo is an individual who resides in Shelby Township, Michigan and who participated in the fraud alleged herein. The precise capacity and role of Campo in the Company and the scheme will be established through discovery.

17. Defendant Celli SPV is a limited liability company organized and existing under the laws of the State of New Jersey with its principal place of business in Rumson, New Jersey. Its true name is presently unknown, but is sometimes referred to by Celli as the "SPV." Upon information and belief, the Celli SPV was formed, funded, and is controlled by Celli and certain of his co-conspirators for the purpose of: (a) acquiring from Michaelson Capital Special Finance Fund L.P. ("Michaelson") portions of outstanding notes previously issued by Titan Environmental (the "Michaelson Note"); (b) engineering a default by Titan

Environmental on the Michaelson Note; and (c) stripping and transferring substantially all of the Company's assets to the Celli SPV, all to the detriment of and without notice to TGP, Network 1, and other Titan Environmental investors.

18. Defendant Gunnello is an individual who resides in East Hanover, New Jersey and who was the owner of Direct Waste, a waste management business that Celli represented would be acquired by Titan Environmental as part of the "3 Initial Acquisitions." Direct Waste had purported revenues of $45,000,000 to $50,000,000. Gunnello was introduced to TGP by Celli to lend credibility to the fraud, and during her interactions with TGP, Gunnello actively confirmed and elaborated upon Celli's false and misleading statements regarding Direct Waste and Titan Environmental's acquisition thereof, thereby becoming an active participant in the fraudulent scheme.

19. Defendant Direct Waste is a limited liability company formed, upon information and belief, in the State of New Jersey with its principal place of business in Newark, New Jersey

20. Each of the Defendants named herein acted as the agent, representative, partner, joint venturer, employee, and/or co-conspirator of each of the other Defendants, and in doing the things alleged herein, each Defendant was acting within the course and scope of such agency, employment, and/or conspiracy with the knowledge, permission, and ratification of the other Defendants.

## FACTUAL ALLEGATIONS

**Background: Titan Environmental Solutions, Inc.**

21. Titan Environmental was formed from the merger of TraqIQ, Inc. (a former name of Titan) with Titan Trucking Co., the company controlled by Jeffrey Rizzo, in or about

May 2023. Following the merger, the Company purported to be in the waste management business and was a publicly traded reporting company quoted on the OTC markets.

22. As of May 24, 2023, Miller was appointed CEO of Titan Environmental, replacing Sikka. Celli, who had experience in publicly traded companies through his prior involvement with BioHiTech America, Inc. ("BHT") and its successor entity Renovare Environmental, Inc. ("Renovare"), became a director and the *de facto* control person of the Company. Celli represented to TGP that through his leadership of BHT, he had delivered substantial shareholder returns through mergers, acquisitions, and capital raises. Celli failed to disclose, however, that BHT/Renovare had originally been a shell company, that Renovare had been delisted from Nasdaq, that Renovare's stock had experienced suspicious trading spikes and drops, and that Renovare had, by the time of Celli's representations, returned to its roots as a non-reporting OTC shell company with no assets and substantial liabilities.

23. In connection with the merger with Titan Trucking Co., Rizzo joined Titan Environmental as COO, together with certain of his family members and affiliates. Rizzo had previously served as COO of Rizzo Environmental Services ("RES") before RES was sold to GFL Environmental Inc. on or about October 3, 2016.

24. Rizzo and Titan Environmental failed to disclose, however, that Rizzo's brother, Charles B. ("Chuck B.") Rizzo, who was also previously associated with RES, had been indicted on or about May 31, 2017 for conspiring to commit bribery and theft in connection with his role at RES, was subsequently convicted, and was sentenced on or about April 23, 2018 to serve 66 months in federal prison and to forfeit $4,000,000. Similarly, Charles P. Rizzo, the father of Jeff Rizzo and Charles B. Rizzo, was sentenced to 90 days in prison in or about July 2018 for his role in the same corruption scandal.

25. Notwithstanding Chuck B.'s criminal history, Titan Environmental secretly engaged him as a paid management consultant beginning on or about May 20, 2023, to identify acquisition targets and assist with merger and acquisition activities. Titan Environmental entered into a consulting agreement with Chuck B. pursuant to which Titan Environmental agreed to pay a monthly retainer of $19,950 per month, plus acquisition bonuses.

26. Notwithstanding each of their obligations to disclose these material facts to investors, at no time did Titan Environmental, Celli, Miller, Rizzo, Jansen, Campo or Gunnello reveal the arrangement Titan Environmental had with Chuck B.

**The Series B Offering and Network 1's Customers' Investments**

27. Beginning in or about January 2024, Titan engaged Alexander Capital, L.P. ("Alexander Capital") and Network 1 as co-placement agents to conduct a private placement offering of Titan Series B Convertible Preferred Stock and warrants (the "Series B Offering").

28. On January 18, 2024, Chris Carlin sent Network 1 representative Vincent LaBarbara an email which led to the introduction of Titan Environmental to Network 1 representatives Eric Rubenstein and David Landskowsky, providing them with the Company's presentation and inviting them to participate in a Company "Teach-In" on January 22, 2024.

29. On January 19, 2024, LaBarbara invited other Network 1 representatives, including among others, Eric Rubenstein, David Landskowsky, Tim Herrmann, Scott Cardone, Todd Harrigan, and Aaron Segal that Alexander Capital had invited Network 1 to participate in a raise for Titan Environmental. The offer was extended by Alexander Capital's Head of Global Equity Capital Markets, Christopher Carlin. At this time, Titan Environmental

represented that the raise was being conducted to complete the acquisition of Standard Waste Services, as disclosed in a Titan Environmental Form 8-K dated January 12, 2024.

30. On February 9, 2024, Network 1 offered to serve as a Placement Agent for Titan Environmental. The offer was extended by Network 1 Director of Investment Banking Damon Testaverde to Titan Environmental CEO Glenn Miller. On or about the same date, Alexander Capital gave Network 1 representatives access to Titan Environmental's data room.

31. Between February and May 2024, Titan Environmental, through its officers and directors including Miller, Celli, and Jeff Rizzo, and its counsel Eric Hellige, Esq. of Pryor Cashman LLP, conducted multiple calls, Zoom meetings, and in-person presentations with Network 1 representatives and prospective investors, describing Titan Environmental's business, financial condition, acquisition pipeline, and prospects. On April 3, 2024, Titan Environmental hosted a Titan Investor Webinar. In or about April 2024, Titan COO Jeff Rizzo and Titan Environmental Director Frank Celli conducted a marketing presentation to Network 1's customers who were potential investors in Titan Environmental.

32. At no point during any of these presentations, meetings, or calls did Titan Environmental or any of its officers, directors, or agents, including Defendants, disclose to Network 1 or its investors that Charles B. Rizzo, a convicted felon, had been serving as a paid consultant to Titan Environmental since May 2023, was receiving monthly retainer payments of $19,950, had been issued a note payable in the amount of $55,000 (issued February 23, 2024), or stood to receive tens of millions of shares of Titan Environmental common stock as compensation.

33. On or about May 15, 2024, Network 1 representatives Vincent LaBarbara, Eric Rubenstein, and David Landskowsky had a direct conversation with Titan Environmental's Corporate Counsel Eric Hellige, Esq. and Titan Environmental CEO Glenn Miller at which time the Network 1 representatives ***specifically and directly*** inquired as to whether there was any type of business relationship between Titan Environmental and Chuck B.. In response, Hellige and Miller each affirmatively represented there was no such relationship and that Chuck B. was not involved with the business of Titan Environmental in any way. This affirmative misrepresentation was false and was known to be false by Hellige and Miller at the time it was made.

34. The Network 1 closings occurred on April 5, 2024 and May 30, 2024. Network 1's investors invested in the Series B Offering during the period from approximately April 1, 2024 through May 16, 2024. In total, on May 30, 2024, Titan Environmental publicly announced that 48 accredited investors had purchased an aggregate of 427,260 shares of Series B Preferred Stock and received warrants to purchase an aggregate of 40,126,500 shares of common stock for an aggregate purchase price of $4,272,600. In connection therewith, it issued warrants to purchase an aggregate of 4,012,650 shares of common stock to Network 1 Financial Securities, Inc. and Alexander Capital, L.P. as placement agents.

35. On or about June 4, 2024 – after the closing of the Series B Offering – Titan Environmental disclosed for the first time in a Form 8-K that: (a) on May 31, 2024, Jeff Rizzo and Chuck B., a "consultant of the Company," had personally guaranteed payment of a Seller Note in connection with the closing of the acquisition of Standard Waste Services, LLC/Standard Disposal, LLC; and (b) in consideration for Chuck B. entering into such personal guaranty, Titan Environmental entered into a Guaranty Fee Agreement with Chuck

B. pursuant to which Titan Environmental agreed to issue to Chuck B. an aggregate of 21,500,000 shares of Titan Environmental Common Stock. This was the first public disclosure of Chuck B.'s involvement with Titan Environmental, and it came *after* Network 1's customers had already made their investments. At or about this same time period, Celli pleaded with Network 1 about deferring the $180,000 compensation "in oder to close" the Standard acquisition. He also affirmatively represented that payment would be made payment within 30-60 days after the close. Had Plaintiffs, through Network 1, have known that Rizzo (or anyone else) was entering into an undisclosed Guaranty Fee Agreements and receiving 21,500,000 shares, Network 1 would never have agreed to defer our compensation or gone forward with the transaction.

36. In a Form 10-Q filed on August 19, 2024, Titan Environmental disclosed for the first time that it had an informal agreement with Chuck B. to continually borrow from him as working capital needs arose, and that as of June 30, 2024, Titan had borrowed an additional $70,000 from him. This lending arrangement was in place prior to the May 30, 2024 closing of the Series B Offering and was not disclosed to the public, including investors.

37. Titan Environmental's prior SEC filings reflected Chuck B.'s involvement only in opaque and deliberately vague terms. In a Form 10 filed on April 15, 2024, at Note 16, Titan Environmental disclosed that it had entered into a consulting agreement dated May 20, 2023 with an unnamed "related party" who "was retained to identify acquisition targets" – but deliberately failed to identify that related party as Chuck B, a previously convicted felon. In the same Form 10, at page F-41, Titan Environmental disclosed that on February 23, 2024, it issued a note payable of $55,000 (with an original discount of $5,000) to an unnamed related party – again deliberately failing to identify that party as Chuck B. In a Form 10-Q filed on

May 15, 2024, Titan Environmental disclosed the existence and general terms of the consulting agreement but again deliberately concealed the identity of the consultant as Chuck B.

38. Network 1's investors would not have invested in the Series B Offering had they known that Chuck B., a convicted felon, was a paid consultant of Titan Environmental with a significant financial stake in the Company's business.

**Chronology of Network 1's Dealings with Titan Environmental (January–October 2024)**

39. On or about January 22, 2024, Alexander Capital's Christopher Carlin invited Network 1 representatives LaBarbara, Rubenstein, Herrmann, Segal, Harrigan, Cardone, and Landskowsky to participate in a further Zoom meeting on January 24, 2024 to discuss Titan Environmental.

40. On or about February 12, 2024, Carlin sought to arrange a February 14, 2024 Zoom meeting involving Titan Environmental's Miller, Celli, and Jeff Rizzo, Network 1 representatives LaBarbara, Rubenstein and other Alexander Capital representatives, to discuss Titan Environmental.

41. On April 3, 2024, Titan Environmental hosted the Titan Investor Webinar, a copy of which was sent by Network 1 to potential investors. That same day, Celli requested that LaBarbara and Landskowsky send Titan Environmental's updated presentation, term sheet, teaser, and documents to Carlin at Alexander Capital.

42. On or about April 17, 2024, Carlin asked Network 1 representatives LaBarbara, Rubenstein, and Landskowsky for their availability for an update call involving Celli, Miller, and other Alexander Capital representatives.

43. On or about April 28, 2024, Landskowsky sought to arrange a Zoom call regarding Titan Environmental among Celli, Carlin, LaBarbara, Rubenstein, and representatives of certain of the co-conspirator investment funds, including the control person of one such fund; Celli responded that he first wanted to speak only with LaBarbara and Carlin.

44. In early 2024, Celli informed Network 1, which was then subsequently confirmed by each of the co-conspirators, that the funds would each invest between 1- 1.5 million into the Series B round. Then on May 10, 2024, one such co-conspirator fund memorialized the commitment by a written "Werewithall Letter" confirming the verbal committed capital which never occurred.

45. On June 4, 2024, Rubenstein requested from Titan Environmental's counsel, Eric Hellige, Esq., and CEO Miller an opportunity to discuss the numbers referenced in Titan Environmental's May 30, 2024 closing announcement. On a conference call that same day with Miller and Hellige, Rubenstein asked that the numbers be corrected; Hellige responded that the correction was not material enough to require an amendment to the Form 8-K.

46. On or about June 10, 2024, Carlin asked Celli and Miller to schedule a meeting with other Alexander Capital representatives and Network 1's LaBarbara, Rubenstein, and Landskowsky to discuss open items. Upon information and belief, such meeting was held on or about June 11, 2024, at which Titan Environmental's additional funding needs, uplisting, SEC filings, and NYSE application process were discussed.

47. On or about June 14, 2024, Carlin was working with other Alexander Capital representatives, Rubenstein, LaBarbara, Landskowsky, Miller, and Celli to address the setting

up of a data room, the drafting and circulation of an S-1 registration statement, and a NYSE/AMEX listing timeline.

48. On June 17, 2024, Landskowsky advised Celli, Miller, and Hellige, as well as Carlin and representatives of certain of the co-conspirator investment funds, that after reading the amendment to the March 29, 2024 Securities Purchase Agreement, he had noted that prior notes had not been exchanged into Series B stock as had been represented to Series B investors. Landskowsky stated that no new money would have been invested without such notes being exchanged, and that the notes were past due and needed to be exchanged immediately.

49. On or about August 9, 2024, Hellige provided Landskowsky with copies of the form of convertible note and warrant for a proposed $2,000,000 to $3,000,000 offering to Alan Goddard.

50. On or about August 14, 2024, Network 1 representatives Landskowsky, LaBarbara, and Rubenstein became aware that Titan Environmental was speaking to a hedge fund interested in investing $3.3 million in Titan Environmental to serve as a bridge to an uplisting, with the hedge fund wanting to participate in the uplisting; the approval of a majority of the Series B stockholders was required, and Network 1 sought their signatures. On August 23, 2024, Rubenstein inquired of Celli as to the status of the $3.3 million funding and the status of execution of the notes.

51. On September 5, 2024, Hellige provided Network 1 representatives LaBarbara, Rubenstein, and Landskowsky with final disclosure schedules for the March 29, 2024 Securities Purchase Agreement.

52. On October 29, 2024, Rubenstein inquired of Celli as to the status of funding, Titan Environmental's uplisting plan and timing, and basic business matters; a conversation on these topics was scheduled to take place on October 30, 2024.

**Revenue and Financial Misrepresentations to Network 1's Customers**

53. In marketing materials, presentations, and investor communications provided to Network 1 and its customers prior to the April 5, 2024 and May 30, 2024 closings, Titan Environmental represented the following projected and combined financial results: (a) 2023 Combined Annualized Pro Forma revenues of $17.7 million, with adjusted EBITDA of approximately $1.1 million; (b) 2024 revenues of $26 million, with adjusted EBITDA of approximately $4.2 million; and (c) a revenue target of $18 million in cash-flow-producing revenue following the close of the Standard Waste Services acquisition.

54. These representations were materially false when made. The actual financial results of Titan Environmental, as subsequently disclosed in Titan Environmental's SEC filings, were a *small fraction* of what was represented: (a) for the year ended December 31, 2023, combined revenues were approximately $6.23 million – not $17.7 million as represented; (b) for the six months ended June 30, 2024 – just one month after the second closing – the Company reported revenues of only approximately $4.4 million and an operating loss of approximately $3.6 million; (c) for the nine months ended September 30, 2024, revenues were approximately $8.3 million and the operating loss was approximately $15.1 million; and (d) for the full year ended December 31, 2024, revenues were approximately $9.57 million – not the projected $26 million – and the operating loss was approximately $5.9 million.

55. According to the Company's Annual Report on Form 10-K for the year ended December 31, 2024, the Company had approximately $9.58 million of revenue, a net loss of approximately $21.5 million, and total liabilities of approximately $24.6 million; and according to the Company's Form 10-Q for the three months ended March 31, 2025, the Company had only approximately $1.7 million of revenues and a net loss of approximately $5.3 million.

56. Additionally, in or about the summer of 2024, Rizzo represented to Celli, and this was in turn communicated to investors, that due to synergies between the combined companies there was a cost redundancy from which the Company would realize additional savings of $700,000 going directly to the bottom line. This representation, too, was false.

57. The operating losses suffered by Titan Environmental in 2024 were not simply the result of poor business performance; they were, upon information and belief, the result of the deliberate misappropriation of investor funds by the Defendants, as described more fully herein.

**The Fraudulent Note Offering and TGP's Investment**

58. Commencing in approximately October 2024, Celli and his co-conspirators, as an outgrowth of a related, larger, ongoing multi-year fraudulent scheme, orchestrated and executed an unlawful scheme to: (a) fraudulently induce TGP to invest $2,500,000 into Titan Environmental's Fraudulent Note Offering of 12% OID convertible promissory notes and purchase warrants; (b) steal the proceeds for certain scheme participants' personal benefit; (c) unlawfully strip and transfer Titan Environmental's assets to the Celli SPV; and (d) conceal their unlawful acts.

59. Celli developed a trust relationship with TGP and then used that relationship, and his position as an insider and undisclosed Chief Executive Officer and Chairman with control of the Company, to make the following specific false and misleading representations to TGP, upon which TGP directly and justifiably relied in making its investment decision:

(a) That Titan Environmental had received confirmation that the NYSE/American exchange had tentatively approved and greenlit the Company's uplisting from the OTC market to the NYSE/American – a representation that was false because no such approval had been obtained;

(b) That Alexander Capital had agreed to raise $10,000,000 for Titan Environmental through a firm commitment underwriting – a representation that was false because, upon information and belief, no such firm commitment underwriting agreement had been executed;

(c) That Oak Ridge Financial ("Oak Ridge") had agreed to raise $15,000,000 for Titan Environmental through a firm commitment underwriting – a representation that was false because, upon information and belief, Oak Ridge never entered into any agreement to act as underwriter for them and, upon information and belief, was not even aware that it had been named as underwriter in an amendment to the Company's S-1 registration statement;

(d) That the shares Titan Environmental common stock ultimately issuable upon exercise of the Notes and Warrants would be registered for resale within a few months following the closing of the Fraudulent Note Offering – a representation that was false because the Company never took the steps necessary to effectuate such registration;

(e) That Titan Environmental's business had and was experiencing substantial organic growth – a representation that was false because its actual operating results reflected massive losses;

(f) That Titan Environmental had entered into binding agreements to acquire three entities (each a "Target Company") in the waste business (the "3 Initial Acquisitions"), with the largest, Direct Waste, having revenues of $45,000,000 to $50,000,000 – representations that were false or materially misleading;

(g) That Titan Environmental had arranged and secured the financing necessary to pay the aggregate cash portion of the purchase price to consummate the 3 Initial Acquisitions – a representation that was false;

(h) That Titan Environmental was a cash-flowing business whose 2024 revenues and EBITDA were approximately $26 million and $4.2 million, whose 2025 revenues and EBITDA would be approximately $34.6 million and $7.6 million, and whose 2026 revenues and EBITDA would be approximately $43.7 million and $10.4 million – representations that were materially false, as demonstrated by Titan Environmental's actual financial results;

(i) That the proceeds received from TGP's purchase of the Notes in the Fraudulent Note Offering would be used and were sufficient to pay all Titan

Environmental costs and expenses to consummate the uplisting, the underwritten public offering, and the 3 Acquisitions – a representation that was false because the proceeds were stolen;

(j) That investing in the Fraudulent Note Offering was a "no-lose" investment because Titan Environmental had more than sufficient assets to repay TGP, and that Celli would personally cause Titan Environmental to liquidate certain specific assets to repay TGP's entire investment plus interest if TGP lost money on its investment. To support this fraudulent representation, Celli provided TGP with a third-party valuation report valuing such assets, upon an orderly liquidation and less the costs and expenses of such liquidation, in excess of $9.5 million – a representation that was fraudulently designed to provide false reassurance to TGP;

(k) That Celli would, upon the closing of the Fraudulent Note Offering, become the CEO and Chairman of Titan Environmental and that his "sole business focus" was growing the company organically and through acquisitions as he was "tired" of making money for others – representations made to induce TGP's confidence and reliance and that were false;

(l) That a control person of one of the Celli co-conspirator investment funds had agreed to invest $50,000,000 in the company within the next few months – a representation that was false and that was made to TGP after TGP had expressed concern to Celli about investing in the company due to the company's lack of other funds. Upon information and belief, such control person and his investment funds had themselves invested in the company and were participants in Celli's scheme.

60. In furtherance of the fraud, Celli arranged, at TGP's request, on-site visits to Direct Waste, which Celli also attended, and personally introduced TGP to Gunnello. During the course of Gunnello's conversations with TGP, Gunnello, individually and through Direct Waste, became an active participant in the scheme by: (a) confirming the false and misleading statements made by Celli regarding Direct Waste and Titan Environmental's proposed acquisition thereof; and (b) providing additional false and misleading information to TGP regarding Direct Waste. Gunnello's motivation was clear: upon the closing of Titan Environmental's acquisition of Direct Waste, Gunnello would receive a substantial cash purchase price from the company.

61. Celli further represented to TGP that the acquisition of Direct Waste by Titan Environmental was secure because Celli was the CEO, an equity holder in, and someone who

exercised control over Direct Waste, and that Direct Waste had signed a binding agreement to be acquired by Celli which Celli had previously assigned to Titan Environmental. Upon information and belief, this representation was false.

62. Indeed, in a power point presentation prepared and approved by each of the Defendants and dated "April 2024," the following was represented: "An additional bolt on acquisition, Standard Waste Services (SWS), is under ***definitive*** agreement and expected to close no later than April 15, 2024." That representation was false as at the time, there was no definitive agreement between Titan Environmenatl and SWS.

63. To demonstrate his business acumen and experience with publicly traded companies, mergers and acquisitions, capital raising, and uplistings, Celli cited his experience with BHT and Renovare, while deliberately failing to disclose: (a) that BHT had originally been a shell company; (b) that Renovare had been delisted from Nasdaq; (c) that Renovare's publicly traded stock had experienced suspicious spikes in trading volume and price followed by significant unexplained drops; (d) that since 2022, Renovare's stock had been quoted on the OTC markets with little if any trading activity; and (e) that Renovare had no assets, substantial liabilities and indebtedness, and had effectively returned to its roots as a non-reporting, OTC Pinks shell company.

64. TGP's initial investment in the Fraudulent Note Offering was made in reliance upon the foregoing misrepresentations, and the Fraudulent Note Offering closed in February 2025. All such misrepresentations and omissions were material to TGP's investment decision.

**The Theft of TGP's Investment and the Stripping of Company Assets**

65. Having successfully induced TGP to invest $2,500,000 in the Fraudulent Note Offering, Celli and his co-conspirators implemented the next phase of their scheme: the theft

and misappropriation of TGP's investment proceeds and the stripping of Titan Environmental's assets.

66. Almost immediately following TGP's final purchase of the Notes and Warrants in the Fraudulent Note Offering, and several times in 2025, Celli requested that TGP provide additional funding to Titan Environmental by purchasing additional Notes and Warrants.

67. When TGP inquired as to why additional funds were necessary given the company's purported strong revenues and EBITDA and the $75 million of additional funding the company had supposedly secured – consisting of $25,000,000 from the two firm commitment public offerings and $50,000,000 from the Celli co-conspirator investment funds, Celli admitted that TGP's investment funds had been stolen, but claimed that Rizzo and certain of his family members had "stolen" all of the proceeds received from the Fraudulent Note Offering.

68. Celli also informed TGP that Rizzo had secretly caused Titan Environmental to incur a Merchant Cash Advance loan, the proceeds of which Rizzo also took, and the repayment of which was being automatically deducted daily from company bank accounts. Even worse, Celli also disclosed that Rizzo, the COO, was caught stealing over $1mm of company money and that he had been fired as a result.

69. None of these events known to Celli had been disclosed to TGP prior to the investment. Accordingly, TGP's $2,500,000 investment was stolen while Celli exercised control over the company.

70. In 2025, Celli told TGP that it was "too bad" that TGP had made a bad investment, but that TGP could "salvage" its bad investment by making a further investment into the Celli SPV.

71. Further, Celli failed to disclose that the assets of the Celli SPV were the former assets of Titan Environmental that had been stripped out of the company and transferred to the Celli SPV.

72. Thus, Celli and Defendants as co--conspirators formed the Celli SPV for the purpose of, among other things, purchasing from Michaelson Capital Special Finance Fund L.P. ("Michaelson") portions of the outstanding Michaelson Note – outstanding secured debt of Titan Environmental's predecessor that had been assumed by Titan Environmental and that was secured by the assets of such predecessor and additional assets of Titan Environmental.

73. Celli – in violation of his fiduciary duties to the company – and his co-conspirators had previously and surreptitiously purchased at least $655,000 of the outstanding Michaelson Note. Following such purchases, Celli – exercising his control over the company – caused Titan Environmental to default on the Michaelson Note by, among other actions, stealing the funds of the company, including TGP's investment proceeds, rendering it unable to make required payments under the Michaelson Note.

74. As a result of the engineered default, and without notice to and/or the consent of any non-Celli-related company stockholders and/or debtholders, including TGP, Celli and his Defendant co-conspirators – including, upon information and belief, Michaelson, and acting through the Celli SPV – illegally and fraudulently stripped the company of substantially all of its assets and transferred and purportedly "sold" those assets to the Celli SPV, all under the guise of a legitimate foreclosure.

75. The assets transferred included, without limitation, the Titan Trucking assets, the SWS assets, the Renovare assets, and the acquisition agreements that had secured the company's obligations under the defaulted Michaelson Note. Upon information and belief, such transfer constituted a fraudulent conveyance, entitling the company and/or its creditors to claw back the stolen assets and to seek the appointment of a trustee or receiver over the company and the Celli SPV.

76. Simultaneously, Titan Environmental, at Celli's direction: (a) ceased filing required SEC annual and quarterly reports; (b) intentionally failed to engage PCAOB-registered auditors; (c) failed to take any steps toward the promised NYSE/American uplisting; (d) refused to proceed with the firm commitment underwritten public offerings with either Alexander Capital or Oak Ridge; and (e) caused its management team to resign from their positions. As a result, Titan Environmental became, in substance, a hollow shell with no assets, no management, and no ongoing business operations. The individual Defendants on the Board of Directors and in executive management resigned, leaving TGP and Network 1's customers with no recourse against them or the company. On January 5, 2026, the SEC declared the Company's S-1 registration statement for the contemplated public offering abandoned.

77. As of the date of this Complaint, TGP holds $2,500,000 of Titan Environmental debt from the Fraudulent Note Offering, representing a complete loss of TGP's investment. The Notes were 13-month notes maturing between November 2025 and January 2026, and are now due and owing; no principal or interest has been paid on the Notes. As of January 30, 2026, Titan Environmental's common stock traded on the OTC at $0.0210 per share, with a market capitalization of approximately $866,204 and de minimis trading volume.

**<u>The Windtree Scheme</u>**

78. In June 2025, with TGP and other Company investors continuing to demand answers and obtain updates from Celli and other members of the Company's board of directors (the "<u>Company Board</u>"), and Celli knowing he could not tell investors the truth, Celli, together with certain private micro-cap investment funds controlled by his co-conspirators, orchestrated and entered into a series of fraudulent transactions (collectively, the "<u>Windtree Transactions</u>"), with Windtree Therapeutics, Inc. ("<u>Windtree</u>"), who at such time was an SEC reporting company and whose common stock was traded on the Nasdaq under the symbol "WINT." The Windtree Transactions had several purposes, including: (i) to decrease the increasing information demands and pressure on Celli and the Company Board from TGP and other Company investors, and (ii) for Celli and the Celli Co-Conspirator Funds to unlawfully make money by selling their Windtree shares before Windtree's shares were delisted from Nasdaq.In or around June 2025, Celli and the Celli co-conspirator funds, who upon information and belief secretly controlled Windtree, purchased Windtree securities in a private placement (the "Windtree June 2025 Private Placement").

79. On June 12, 2025, the Company and Windtree each disclosed in their respective Form 8-Ks that the Company and Windtree had entered into a binding letter of intent pursuant to which Windtree would acquire all of the outstanding securities of the Company for $35 million of Windtree securities, plus Windtree's purchase of $1,750,000 of bridge notes from a subsidiary of the Company. Upon information and belief, such public disclosure was made to provide TGP and other company investors with false hope that their investments were not lost and to maintain the public market for Windtree's common stock, and was known by Celli and the Celli Co-Conspirator Funds to be false and misleading when

made because they knew the acquisition would never close, including because Windtree's common stock would be delisted from Nasdaq.

80. On June 20, 2025, Windtree disclosed that it had received, on June 18, 2025, a Nasdaq deficiency letter relating to the eligibility of Windtree common stock to continue trading on Nasdaq.

81. On July 10, 2025, in order to position Celli and the Celli co-conspirator funds to sell their Windtree shares prior to the Nasdaq delisting, Celli and the Celli co-conspirator funds took advantage of their control person status and caused Windtree to file a pre-effective amendment to its S-1 selling stockholder registration statement for the sole purpose of adding Celli as a selling shareholder with respect to the Windtree shares of common stock underlying the securities Celli purchased in the Windtree June 2025 Private Placement. Notably, Celli was the only additional selling shareholder added to the Windtree S-1 registration statement following the date of the original filing of the Windtree S-1 with the SEC in May 2025. According to the Windtree S-1, on June 27, 2025 – shortly before the initial filing of the Windtree S-1 – Windtree had issued to Celli a convertible promissory note in the principal amount of $96,899 and a warrant to purchase shares of Windtree common stock.

82. Also on July 10, 2025, Windtree submitted its acceleration request to the SEC, and the next day, on July 11, 2025, the Windtree S-1 was declared effective by the SEC.

83. Just three trading days after Celli's Windtree shares became registered for resale, on July 16, 2025 – and in order to ensure that Celli and the Celli Co-Conspirator Funds could profit from their purchases in the Windtree June 2025 Private Placement – Windtree, which had only recently announced its biotech strategy, made the sensational public disclosure that it was entering the then red-hot crypto business and that it had entered into a

securities purchase agreement with specific purchasers pursuant to which Windtree would sell up to $200,000,000 of its securities, using the net cash proceeds to acquire BNB tokens as part of a newly announced "BNB treasury strategy." The purchasers' obligations were subject to broad conditions precedent that were, upon information and belief, never capable of being satisfied – including a condition that Windtree's common stock could neither be suspended from Nasdaq nor could Nasdaq have threatened such suspension, a condition that had already been triggered by the June 18, 2025 Nasdaq deficiency letter.

84. From July 14, 2025, through July 18, 2025, Windtree's common stock traded approximately 300,000,000 shares on Nasdaq – a dramatic spike in volume during which, upon information and belief, Celli and his co-conspirators were able to sell their Windtree shares pursuant to the then-effective S-1. Following the July 16, 2025 announcement, the market price of Windtree's shares soared, increasing by more than [40%] over the price on the date the Windtree S-1 went effective.

85. These increases in the trading price and trading volume of Windtree's shares resulted directly from the intentional efforts of Celli and the Celli co-conspirator funds to artificially manipulate the public market for Windtree common stock and, as undisclosed control persons and insiders, to obtain, share, and use material non-public information in connection with their purchases and sales of Windtree stock, reaping substantial trading profits at the expense of the investing public.

86. On August 19, 2025, Windtree publicly disclosed that Nasdaq would delist Windtree's common stock effective August 21, 2025. As confirmed by Windtree's subsequent disclosures in its SEC filings, Windtree never sold any of its securities in connection with its announced $200 million capital raise, never purchased any BNB tokens, and never executed

its publicly announced BNB treasury strategy, and the investors who had agreed to fund the Windtree BNB strategy never purchased any Windtree securities.

87. On October 5, 2025, Celli resigned as a member of the Titan Environmental Board of Directors.

88. On November 13, 2025, Windtree disclosed the cancellation of its proposed acquisition of Titan Environmental, and that Titan Environmental had agreed to pay Windtree a termination fee of $7,500,000 – a payment that, upon information and belief, Titan Environmental had no means to make and that further encumbered the Company to the detriment of its investors, including TGP.

89. In or around March 24, 2026 Landskowsky and La Barbara had a call with, Ed Borkowsky, a member of the Board of Directors, who provided an update, stating that Celli is doing a great job turning things around. For example, he said Celli purchased 20 new trucks, which would lower cost and maintenance. When asked what Celli's current role was at Titan, Borkowsky stated Celli was acting as the CEO.

**<u>Defendants' Scienter</u>**

90. Defendants acted with knowledge of the falsity of their representations and omissions, or with deliberate recklessness as to their truth or falsity. The following facts, among others, support a strong inference of fraudulent intent:

- Celli and the Company's officers and directors, including Defendants, had direct and personal knowledge of Chuck B.'s criminal conviction, his sentence to federal prison, his ongoing paid consulting relationship with Titan Environmental, his receipt of millions of shares of company stock, and his informal lending relationship with the company, all of which they deliberately concealed from Network 1 and its customers through vague SEC filings that omitted his identity;
- Despite direct, specific, and pointed questioning by Network 1's representatives on or about May 15, 2024, Titan's CEO Miller and Titan's legal counsel affirmatively and falsely denied that Chuck B. had any

relationship with or involvement in the business of Titan – a false statement made just weeks before the Guaranty Fee Agreement awarding him 21,500,000 shares of Titan stock was executed and disclosed;

- Celli made specific, detailed, and verifiable representations to TGP regarding the NYSE/American uplisting, the firm commitment underwriting agreements with Alexander Capital and Oak Ridge, Titan Environmental's projected revenues and EBITDA, and the 3 Initial Acquisitions – representations that Celli knew, at the time he made them, to be false;
- Celli intentionally caused Titan Environmental to default on the Michaelson Note in order to engineer the transfer of company assets to the Celli SPV, which he controlled – demonstrating premeditated fraudulent intent;
- Celli's solicitation of TGP to invest in the Celli SPV – while concealing that the Celli SPV's assets were Titan Environmental's former assets – demonstrates consciousness of guilt and deliberate deception;
- Titan Environmental's deliberate cessation of SEC reporting and refusal to engage PCAOB auditors was designed to prevent discovery of the fraud;
- The timing and structure of the Windtree transactions, including Celli's registration as a selling stockholder before the announcement of the illusory $200 million capital raise and the resulting extraordinary trading volume, is consistent with a coordinated scheme to profit at the expense of public investors.

91. The foregoing facts, taken together and as a whole, give rise to a strong inference that Defendants acted with the requisite scienter to defraud Plaintiffs and Network 1's customers.

**Reliance, Causation, and Damages**

92. TGP directly and justifiably relied upon Celli's misrepresentations and omissions in deciding to invest $2,500,000 in the Fraudulent Note Offering. TGP would not have made its investment had it known the truth. As a direct and proximate result of Defendants' fraud, TGP has suffered a complete loss of its $2,500,000 investment.

93. Network 1's customers directly and justifiably relied upon Titan Environmental's misrepresentations and omissions in deciding to invest in the Series B Offering. Network 1's customers would not have made their investments had they known that: (a) Chuck B., a convicted felon, was a paid consultant of Titan Environmental with a

significant financial interest in the Company; (b) Titan Environmental's represented revenues and EBITDA figures were materially false; or (c) Network 1 would not have approved the sale of the Series B Offering had it known of Chuck B.'s involvement. As a direct and proximate result of Defendants' fraud, Network 1's customers have suffered the complete or substantial loss of their investments totaling approximately $4,272,600.

94. For purposes of Plaintiffs' securities fraud claims, Plaintiffs also invoke the presumption of reliance under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), applicable to omission-based securities fraud claims, to the extent that the claims herein are primarily based upon Defendants' failure to disclose material facts.

95. Plaintiffs have suffered damages in an amount to be proven at trial, but in no event less than $6,772,600, plus accrued interest, punitive damages, attorneys' fees, and costs.

## <u>CAUSES OF ACTION</u>

### COUNT I
### Violations of Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 Thereunder
### (Against All Defendants)

96. Plaintiffs repeat and reallege each and every allegation contained in the preceding paragraphs as if fully set forth herein.

97. This Count is asserted under Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5. Section 10(b) makes it unlawful for any person, in connection with the purchase or sale of any security, to use or employ any manipulative or deceptive device or contrivance in contravention of SEC rules and regulations. Rule 10b-5 makes it unlawful for any person to: (a) employ any device, scheme, or artifice to defraud; (b) make any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made,

in light of the circumstances under which they were made, not misleading; or (c) engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

98. The Notes, Warrants, and Series B Convertible Preferred Stock purchased by Plaintiffs and Network 1's customers are "securities" within the meaning of the Securities Exchange Act of 1934.

99. As alleged in detail above, in connection with TGP's purchase of the Notes and Warrants in the Fraudulent Note Offering, Celli – individually and on behalf of Titan Environmental and the co-conspirator Defendants – made materially false and misleading statements and omitted to state material facts. The specific false and misleading statements and omissions are identified in subparagraphs (a) through (l) of the paragraph above setting forth Celli's specific false and misleading representations to TGP and are incorporated herein by reference. Each such statement was false when made; the speaker knew it was false when made or made it with deliberate recklessness as to its falsity; the statements were made in connection with TGP's purchase of securities; and TGP relied upon those statements to its detriment.

100. As alleged in detail above, in connection with Network 1's customers' purchase of Series B Convertible Preferred Stock in the Series B Offering, Titan, Miller, Jeff Rizzo, and the other officer and director Defendants: (a) made materially false and misleading statements regarding Titan Environmental's revenues, EBITDA, and financial projections; (b) failed to disclose that Chuck. B. was a paid consultant and related party of the company; (c) affirmatively denied Chuck B.'s involvement when directly questioned by Network 1's representatives on or about May 15, 2024; (d) concealed Chuck B.'s identity in SEC filings

by referring to him only as an unnamed "related party"; and (e) failed to timely disclose the Guaranty Fee Agreement awarding Chuck B. 21,500,000 shares of company stock. Each such statement and omission was material, was made with scienter, and was relied upon by Network 1's customers in making their investment decisions.

101. The foregoing misrepresentations and omissions were made with scienter as described in the section entitled "Defendants' Scienter" above.

102. Plaintiffs and Network 1's customers suffered substantial damages as a direct and proximate result of Defendants' violations of Section 10(b) and Rule 10b–5.

**COUNT II**
**Control Person Liability Under Section 20(a) of the Securities Exchange Act of 1934**
**(Against Defendants Celli, Miller, Jeff Rizzo, Jansen and Campo)**

103. Plaintiffs repeat and reallege each and every allegation contained in the preceding paragraphs as if fully set forth herein.

104. Section 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78t(a), provides that every person who, directly or indirectly, controls any person liable under the Exchange Act for any violation of the Act is jointly and severally liable with and to the same extent as such controlled person, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

105. At all relevant times, Defendants Celli, Miller, Jeff Rizzo, Jansen, and Campo were "controlling persons" of Titan Environmental within the meaning of Section 20(a) of the Exchange Act. Each of these Defendants had the power and ability to control the business of

Titan Environmental, approve its SEC filings and investor communications, and direct the actions of the Company that constituted violations of Section 10(b) and Rule 10b-5 as alleged herein.

106. By reason of their positions as officers and/or directors of Titan Environmental and their exercise of control and authority, these Defendants had the power to influence and did influence and control, directly or indirectly, the decision-making of the Company and caused Titan Environmental to engage in the violations of the securities laws alleged herein.

107. None of these Defendants acted in good faith or is otherwise exempt from liability. Each of them directly or indirectly induced the acts constituting the primary violations or failed to prevent such violations despite having the power to do so.

108. Plaintiffs are entitled to recover from these Defendants jointly and severally, together with interest, to the same extent as they are entitled to recover from Titan Environmental.

**COUNT III**
**Common Law Fraud**
**(Against All Defendants)**

109. Plaintiffs repeat and reallege each and every allegation contained in the preceding paragraphs as if fully set forth herein.

110. Defendants made material misrepresentations and omissions of material fact to TGP and to Network 1's customers, as alleged in detail above.

111. Defendants knew that their representations were false when made, or made them with reckless disregard for their truth or falsity.

112. Defendants intended that Plaintiffs and Network 1's customers would rely upon their misrepresentations and omissions in deciding to make their respective investments.

113. TGP and Network 1's customers justifiably relied upon Defendants' misrepresentations and omissions in deciding to invest.

114. As a direct and proximate result of Defendants' fraudulent misrepresentations and omissions, Plaintiffs and Network 1's customers have suffered damages in an amount to be proven at trial. The individual Defendants are jointly and severally liable for such damages.

**COUNT IV**
**Civil Conspiracy to Commit Fraud**
**(Against All Defendants)**

115. Plaintiffs repeat and reallege each and every allegation contained in the preceding paragraphs as if fully set forth herein.

116. Defendants entered into a concerted agreement, combination, and conspiracy among themselves to defraud TGP and Network 1's customers as described herein.

117. In furtherance of this conspiracy, each of the Defendants committed overt acts, including without limitation: making false and misleading statements to Plaintiffs; introducing Plaintiffs to co-conspirators for the purpose of reinforcing the fraud; arranging on–site visits to target companies for the purpose of lending false credibility to the misrepresentations; actively concealing the identity and criminal background of Chuck B.; denying Chuck B.'s involvement when directly questioned; causing Titan Environmental to cease filing required SEC reports; engineering the default on the Michaelson Note; and stripping and transferring company assets to the Celli SPV.

118. As a direct and proximate result of this conspiracy, Plaintiffs and Network 1's customers have suffered damages in an amount to be proven at trial. All Defendants who participated in the conspiracy are jointly and severally liable for all damages resulting from the conspiracy.

**COUNT V**
**Breach of Fiduciary Duty**
**(Against Defendants Celli, Miller, Jeff Rizzo, Jansen and Campo)**

119. Plaintiffs repeat and reallege each and every allegation contained in the preceding paragraphs as if fully set forth herein.

120. As officers and/or directors of Titan Environmental, Defendants Celli, Miller, Jeff Rizzo, Jansen, and Campo owed fiduciary duties of loyalty and care to Titan Environmental's shareholders and investors, including Plaintiffs.

121. These Defendants breached their fiduciary duties by: (a) making false and misleading representations to induce Plaintiffs' investments; (b) concealing material information, including the identity, criminal background, and financial stake of Chuck B.; (c) misappropriating and permitting the theft of investor proceeds; (d) causing Titan Environmental to strip and transfer its assets to the Celli SPV for the personal benefit of Celli and his co-conspirators; (e) causing the company to cease filing required SEC reports; and (f) abandoning Titan Environmental by resigning from their positions, leaving investors without any recourse against a functioning company.

122. As a direct and proximate result of these breaches of fiduciary duty, Plaintiffs and Network 1's customers have suffered damages in an amount to be proven at trial.

**COUNT VI**
**Conversion**
**(On Behalf of TGP Against Defendants Celli and the Celli SPV)**

123. Plaintiff TGP repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

124. TGP's $2,500,000 investment proceeds were specific and identifiable funds delivered to Titan Environmental as consideration for the Notes and Warrants issued in the Fraudulent Note Offering.

125. Defendants Celli and the Celli SPV, along with others who have not yet been disclosed, , without authorization and in derogation of TGP's rights as a noteholder and investor, wrongfully took, misappropriated, converted, and deprived TGP of those funds for their own use and benefit.

126. TGP demanded the return of its investment but Defendants have refused and continue to refuse to return the funds.

127. As a direct and proximate result of Defendants' conversion of TGP's funds, TGP has suffered damages in an amount to be proven at trial, but in no event less than $2,500,000 plus accrued interest.

**COUNT VII**
**Unjust Enrichment**
**(Against All Defendants)**

128. Plaintiffs repeat and reallege each and every allegation contained in the preceding paragraphs as if fully set forth herein.

129. Defendants were enriched at the expense of Plaintiffs and Network 1's customers through the receipt and conversion of Plaintiffs' and Network 1's customers'

investment proceeds, which were obtained through fraudulent misrepresentations and omissions.

130. It is against equity and good conscience to permit Defendants to retain the benefits they have unjustly received at Plaintiffs' and Network 1's customers' expense.

131. Plaintiffs are entitled to restitution, disgorgement, and an accounting of all profits and proceeds derived by Defendants from the fraudulent scheme.

**COUNT VIII**
**Aiding and Abetting Fraud**
**(Against Defendants Gunnello and Direct Waste)**

132. Plaintiffs repeat and reallege each and every allegation contained in the preceding paragraphs as if fully set forth herein.

133. As alleged herein, the primary Defendants committed fraud against Plaintiffs and Network 1's customers.

134. Defendant Gunnello had actual knowledge of the fraudulent scheme and knowingly and substantially participated therein by: (a) confirming Celli's false and misleading statements to TGP regarding Direct Waste and Titan's proposed acquisition thereof; and (b) providing additional false and misleading information to TGP regarding Direct Waste.

135. Defendants had actual knowledge of the fraudulent scheme and knowingly and substantially participated therein by, among other things, making false representations to TGP regarding their intended investments in the company, co-investing with Celli in the Celli SPV, and participating in the Windtree scheme.

136. As a direct and proximate result of the aiding and abetting conduct of these Defendants, Plaintiffs and Network 1's customers have suffered damages in an amount to be proven at trial.

**COUNT IX**
**Violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(c)**
**(Against Defendants Celli, Miller, Jeff Rizzo, Jansen, Campo, Gunnello, Direct Waste and the Celli SPV)**

137. Plaintiffs repeat and reallege each and every allegation contained in the preceding paragraphs as if fully set forth herein.

138. At all relevant times, each Plaintiff and each Defendant was a "person" within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c).

139. At all relevant times, Defendants Celli, Miller, Jeff Rizzo, Jansen, Campo, Gunnello, Direct Waste and the Celli SPV, together with Titan Environmental and the co-conspirator investment funds identified herein, constituted an association-in-fact "enterprise" within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c) (the "Celli Enterprise"). The Celli Enterprise had an ongoing organization and structure, with Celli as its leader and organizer, and its members functioned as a continuing unit with the common purposes of: (a) fraudulently inducing investors to entrust funds to Titan Environmental; (b) stealing, converting, and misappropriating those funds and Titan Environmental's assets for the personal benefit of the Celli Enterprise's members; and (c) concealing such unlawful conduct. Each Defendant is a person distinct from the Celli Enterprise itself.

140. At all relevant times, the Celli Enterprise was engaged in, and its activities affected, interstate commerce. The members of the Celli Enterprise operated in and across multiple states, including New York, New Jersey, Michigan, and Delaware, and made use of

interstate wires, the mails, and interstate banking facilities in furtherance of the scheme alleged herein.

141. Each of the foregoing Defendants was employed by or associated with the Celli Enterprise and knowingly conducted or participated, directly or indirectly, in the conduct of the Celli Enterprise's affairs.

142. Defendants conducted the affairs of the Celli Enterprise through a "pattern of racketeering activity" within the meaning of 18 U.S.C. §§ 1961(1), 1961(5), and 1962(c), consisting of multiple related acts indictable as: (a) mail fraud, in violation of 18 U.S.C. § 1341, including the use of the United States mails and interstate carriers to transmit false and misleading offering materials, investor communications, and transaction documents; (b) wire fraud, in violation of 18 U.S.C. § 1343, including the use of interstate wire communications – emails, telephone calls, video conferences, webinars, and electronic funds transfers – to disseminate false and misleading statements and to transfer, divert, and conceal stolen funds; (c) the interstate transportation and receipt of stolen money and property, in violation of 18 U.S.C. §§ 2314 and 2315; and (d) money laundering and engaging in monetary transactions in property derived from specified unlawful activity, in violation of 18 U.S.C. §§ 1956 and 1957.

143. In pleading the foregoing predicate acts, Plaintiffs do not rely upon any conduct that would have been actionable as fraud in the purchase or sale of securities, which conduct is excluded from the predicate acts available to a civil RICO plaintiff by 18 U.S.C. § 1964(c). The predicate acts supporting this Count consist of conduct distinct from any purchase or sale of securities, including the post-investment theft, conversion, and misappropriation of Plaintiffs' funds; the engineering of Titan Environmental's default on the

Michaelson Note; the sham foreclosure and fraudulent transfer of Titan Environmental's assets to the Celli SPV; and the interstate transfer, transportation, and laundering of the stolen funds.

144. The predicate acts alleged herein are related in that they share common purposes, participants, victims, and methods of commission, and they amount to and pose a threat of continued criminal activity. The scheme has spanned from at least May 2023 through 2026 and is continuing, thereby satisfying both closed-ended and open-ended continuity.

145. As a direct and proximate result of Defendants' violations of 18 U.S.C. § 1962(c), Plaintiffs have been injured in their business and property within the meaning of 18 U.S.C. § 1964(c), including through the loss of TGP's $2,500,000 investment and the losses sustained by Network 1 and its customers in connection with the Series B Offering.

146. Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover threefold the damages they have sustained, together with the costs of this suit and reasonable attorneys' fees.

**COUNT X**
**Conspiracy to Violate RICO, 18 U.S.C. § 1962(d)**
**(Against All Defendants)**

147. Plaintiffs repeat and reallege each and every allegation contained in the preceding paragraphs as if fully set forth herein.

148. Defendants knowingly agreed and conspired with one another to violate 18 U.S.C. § 1962(c), as alleged in Count IX. Each Defendant agreed to further and facilitate the criminal scheme of the Celli Enterprise and agreed that a member of the conspiracy would commit at least two predicate acts of racketeering activity in the conduct of the affairs of the Celli Enterprise.

149. The overt acts taken by Defendants in furtherance of the conspiracy include, without limitation, the acts alleged throughout this Complaint, including the false and misleading representations made to Plaintiffs, the theft and diversion of the proceeds of the Fraudulent Note Offering, the engineered default on the Michaelson Note, and the stripping and transfer of Titan Environmental's assets to the Celli SPV.

150. As a direct and proximate result of Defendants' violations of 18 U.S.C. § 1962(d), Plaintiffs have been injured in their business and property and are entitled to recover treble damages, the costs of this suit, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c).

**COUNT XI**
**Violations of Sections 273, 274, 275 and 276 of the**
**New York State Debtor and Creditor Law**

151. Plaintiffs repeat and reallege the prior allegations as if fully set forth herein.

152. Plaintiff is and was at all relevant times a creditor of Defendants within the meaning of Section 270(1) of the Debtor and Creditor law of the State of New York.

153. The aforesaid conveyances and commingling of assets and intentional undercapitalization of Defendants were made without fair consideration and at a time when Defendants were insolvent within the meaning of Section 271(1) of the Debtor and Creditor law and/or for the explicit purpose of leaving Defendants insolvent and unable to satisfy its admitted debt to Plaintiffs. As such, all such conveyances by and between Defendants must be set aside.

154. In the alternative, the aforesaid conveyances and commingling of assets, made without fair consideration, rendered each of those Defendants insolvent in that the value of its

assets at the time was less than the amount that was required to pay its liability on existing debts to Plaintiff as they became absolute and matured.

155. As a direct result of the conveyances, Plaintiffs, standing in the shoes of assignees and as assignees, waere injured, for which all Defendants are liable for an amount to be determined at trial but believed to be in excess of $5,000,000, plus all interest, costs and fees that continue to accrue on a daily basis.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request that this Court enter judgment in their favor and against Defendants as follows:

A. Compensatory damages in favor of TGP in the amount of $2,500,000, plus pre-judgment and post-judgment interest;

B. Compensatory damages in favor of Network 1 and Network 1's customers in an amount of not less than $4,272,600, plus pre-judgment and post-judgment interest;

C. Punitive and exemplary damages against all Defendants in an amount to be determined at trial, commensurate with the willful, wanton, and deliberate nature of Defendants' fraudulent conduct;

D. Treble damages pursuant to 18 U.S.C. § 1964(c), together with the costs of suit and reasonable attorneys' fees;

E. Disgorgement and restitution of all profits, gains, and unjust enrichment obtained by Defendants as a result of the unlawful acts and practices alleged herein;

F. An order requiring Defendants to account for all funds received from Plaintiffs and Network 1's customers and all proceeds derived from the fraudulent scheme;

G. Reasonable attorneys' fees and costs to the extent permitted by law, including under the fee-shifting provisions of applicable law;

H. Pre-judgment and post-judgment interest at the maximum rate permitted by law;

I. Such other and further relief as this Court deems just and proper.

**JURY DEMAND**

Plaintiffs hereby demand a trial by jury on all issues so triable.

Dated: September 21, 2026

THE ROTH LAW FIRM PLLC

By: R. Roth
Richard A. Roth, Esq.
295 Madison Avenue, Floor 22
New York, NY 10017
(212) 542-8882

*Attorneys for Plaintiffs*